Electronically FILED by
Superior Court of California,
County of Los Angeles
1/16/2025 11:44 AM
David W. Slayton,
Executive Officer/Clerk of Court,
By E. Galicia, Deputy Clerk

1 | **DAVID B. JONELIS (BAR NO. 265235)**
2 | **MEGAN S. MALLONEE (BAR NO. 340276)**
  | **LAVELY & SINGER**
3 | **PROFESSIONAL CORPORATION**
  | 2049 Century Park East, Suite 2400
4 | Los Angeles, California 90067-2906
  | Telephone: (310) 556-3501
5 |
6 | Attorneys for Plaintiff
  | ZYLAR PICTURES, LLC
7 |
8 | SUPERIOR COURT OF THE STATE OF CALIFORNIA
9 | COUNTY OF LOS ANGELES - CENTRAL DISTRICT

| | |
|---|---|
| ZYLAR PICTURES, LLC, | CASE NO. 25STCV01114 |
| Plaintiff, | **COMPLAINT FOR:** |
| vs. | 1) **FRAUD** |
| ROBERT HALMI, and DOES 1 through 10, inclusive, | **[JURY TRIAL DEMANDED]** |
| Defendants. | |

---

1

COMPLAINT

Plaintiff ZYLAR PICTURES, LLC ("Plaintiff" or "Zylar") alleges as follows:

**INTRODUCTION**

1. This case arises out of the outrageous and fraudulent conduct of defendant ROBERT HALMI, JR. ("Defendant" or "Halmi"), who (along with his currently unidentified cohorts, sued here as Doe Defendants) hatched a scheme to convince Zylar to license the valuable distribution rights for over 30 film projects to a shell company with no capital – undoubtedly in order to leverage those rights for a more lucrative agreement that would benefit Halmi to the detriment of Zylar.

2. As described herein, Halmi induced Zylar into licensing its projects for a $6.5 million <u>guaranteed minimum</u> license fee (payable in nine installments), based on false and fraudulent representations that Zylar would be paid by the supposedly solvent media company Screen Media Ventures, LLC ("Screen Media"). Instead, the contract that was ultimately presented to Zylar by Halmi was with a foreign shell corporation registered in the Isle of Man: Halcyon Holdings Limited ("HHL"). Nonetheless, Halmi assured Zylar that the deal was still effectively with Screen Media (whom Halmi claimed to be representing), and that the license fees would come from Screen Media.

3. In fact, Screen Media did purchase the distribution rights to Zylar's projects as part of a $21.1 million transaction with HHL; however, Zylar was never paid the majority of the $6.5 million that it was owed for the projects. Instead, after receiving its two initial installment payments of $500,000, Zylar never received the remaining $5.5 million of its guaranteed fee. Nor did Zylar ever receive a portion of the gross receipts from the projects, despite the fact that the projects were openly exploited by Screen Media. Zylar now reasonably suspects that Halmi received the lion's share of the money from the Screen Media transaction, including the monies that should have gone to Zylar.

4. To add insult to injury, not only has Zylar been deprived of the payment it was promised by Halmi, but it has since become clear that Halmi intentionally made HHL an intermediary to the Screen Media transaction so that he could direct the Screen Media payments to himself instead of Zylar. In other words, by inducing and tricking Zylar to contract with HHL instead of directly with Screen Media, Halmi defrauded Zylar for his own monetary benefit. Ultimately, Zylar's distribution rights were tied up for over a year while it suffered financial and reputational damages caused by Halmi's scheme, which no doubt resulted in millions of dollars in his own pocket.

5. Through this action, Zylar seeks to recover the financial and reputational losses suffered as a result of Halmi's fraud, as well as punitive damages in an amount sufficient to prevent Halmi from similarly deceiving others for his own gain in the future.

**PARTIES, JURISDICTION AND VENUE**

6. Plaintiff Zylar is, and at all times relevant hereto has been, a Nevada limited liability company with its principal place of business located in the County of Los Angeles, California. Prior to January 8, 2025, Zylar was known and operating as Cartel Pictures, LLC.

7. On information and belief, Defendant Halmi is, and at all relevant times herein was, an individual residing in New York and doing substantial business in the County of Los Angeles, California (including in connection with the transaction at issue here).

8. Plaintiff is presently unaware of the true names and capacities of the defendants sued herein as Does 1 through 10, inclusive, and therefore sues said defendants by fictitious names. Plaintiff will amend this Complaint to allege the true names and capacities of such fictitiously named defendants when their names and capacities have been ascertained. Plaintiff is informed and believes and based thereon alleges that each of the fictitiously named defendants is responsible in some manner for the occurrences, acts and omissions alleged herein and that Plaintiff's damages were proximately caused by their conduct. Hereinafter, Halmi and Doe Defendants 1 through 10, inclusive, will sometimes be referred to collectively as "Defendants."

9. Plaintiff is informed and believes and based thereon alleges that each defendant at all times mentioned in this Complaint was the agent, employee, partner, joint venturer, co-conspirator, and/or employer of the other defendants and was at all times herein mentioned acting within the course and scope of that agency, employment, partnership, conspiracy, ownership, or joint venture. Plaintiff is further informed and believes, and thereon alleges, that the acts and conduct herein alleged of each defendant was known to, authorized by and/or ratified by the other defendants, and each of them.

**FACTS COMMON TO ALL CAUSES OF ACTION**

10. Zylar's Los Angeles based production business has over 100 television and film projects to its credit.

11. In August 2022, Halmi approached Stan Spry, a founding partner of Zylar, to tell him

that the distribution company Screen Media – which is a subsidiary of well-known American media conglomerate Chicken Soup for the Soul Entertainment ("CSSE") – was supposedly in urgent need of content for distribution.  At the time, Zylar had 30 titles needing distribution.

12. At Halmi's request, Mr. Spry sent him a list of available content for which Zylar held distribution rights that were available for licensing to Screen Media (collectively, the "Zylar Projects").  The Zylar Projects included the film *Monsters of California*, a sci-fi film written and directed by Blink-182 vocalist and guitarist Tom DeLonge.

13. On September 2, 2022, Halmi asked Mr. Spry what Zylar would expect for payment in exchange for the Zylar Projects. Mr. Spry responded that Zylar expected to get at least one million dollars for just *Monsters of California* alone.  Halmi responded that he would "work on an offer for the package."

14. Ultimately, Halmi presented an offer to Zylar for Screen Media to license the Zylar Projects for a minimum guaranteed license fee of $6.5 million, including $1.5 million for worldwide distribution rights for *Monsters of California* and $5 million for international distribution rights for the remaining twenty-nine titles, the equivalent of $175,000 per title.  Halmi repeatedly represented this as a "Screen Media deal."

15. Relying on Halmi's repeated representations, on or around October 15, 2022, Zylar entered into an agreement to license the Zylar Projects (the "Zylar License Agreement").  However, at the last minute, HHL – which Zylar is informed and believes is a shell company registered offshore in the Isle of Man, with no assets – was substituted as the contractual licensee under the Zylar License Agreement.

16. Notwithstanding that the Zylar License Agreement was signed between Zylar and HHL, Halmi continued to assure Zylar that Screen Media was the actual entity that would be paying for the Zylar Projects, and likewise assured Zylar that he would make certain that payment of Zylar's fee flowed properly to Zylar through HHL.  In fact, on October 29, 2022, Halmi specifically assured Mr. Spry, "***You have a deal with a company I represent in the US. That company made a deal with***

1 *Screen Media after you and I agreed on terms and you signed that agreement.*"[1]

2   17.   Despite Halmi's assurance to Zylar that he "represented" the company that Zylar was contracting with (*i.e.*, HHL), Halmi and his attorney, Kevin Sisson, subsequently purported to disclaim any relationship between Halmi and HHL – going so far as to claim that Halmi had absolutely <u>nothing</u> to do with HHL.

   18.   Zylar is informed and believes that, at the same time as he was negotiating the Zylar License Agreement (supposedly on Zylar's behalf), Halmi had already negotiated a separate distribution agreement between Screen Media and HHL (the "Screen Media License Agreement") for Screen Media to sublicense content that was licensed to HHL. The Screen Media License Agreement, signed on or around November 2, 2022, provided for Screen Media to pay a ***$21.1 million license fee*** to HHL in exchange for rights that included the Zylar Projects. Of that $21.2 million, $1.5 million was supposedly attributable to the rights to *Monsters of California* and the remainder was supposedly attributable to the titles licensed under the Zylar License Agreement as well as other titles offered to Screen Media by Halmi. To date, however, Zylar has never actually received an unredacted copy of the Screen Media License Agreement (despite its repeated requests and despite its right to to review and approve any sublicenses under the Zylar License Agreement) – and thus Zylar has been kept in the dark as to many of the specific terms in the Screen Media License Agreement. Nonetheless, the Zylar License Agreement and the Screen Media License Agreement have been referred to by Halmi's attorney, Kevin Sisson, as the "back-to-back" agreements.

   19.   Under the Zylar License Agreement, Zylar's guaranteed $6.5 million License Fee had an initial installment of $500,000 payable by no later than December 8, 2022, followed by eight $750,000 installments payable every three months until November 22, 2024 (adding up to the total $6.5 million license fee).

   20.   Based on information learned after the fact, Zylar is now informed and believes that HHL (under its own "back to back" agreement with Screen Media) received an initial payment of $9.6

---

[1] This statement further underscores Halmi's fraudulent conduct insofar as Halmi held out HHL as a company based "in the US," when in fact Halmi was well-aware that HHL was nothing more than a foreign shell company.

5

COMPLAINT

million from Screen Media by no later than December 1, 2022, as was mandated under the Screen Media License Agreement. Accordingly, as of December 1, 2022, HHL should have received more than enough money to timely pay Zylar the entire $6.5 million license fee owed under the Zylar License Agreement.

21. However, since entering into the Zylar License Agreement, Zylar has only received payment of $1 million (comprised of the first installment and partial payment of the second installment). It has never received the remaining $5.5 million of its minimum guaranteed license fee, nor has it received any portion of the receipts from the distribution of the Zylar Projects.

22. On February 15, 2023, Mr. Spry sent an invoice to Halmi for the second installment payment of $750,000 under the Zylar License Agreement. Consistent with his prior representations and assurances to Zylar, Halmi indicated that the payment would be coming from Screen Media/CSSE, writing: "Working on getting this from CSSE. (May not be easy until they close there [sic] new bank loan in a few weeks)." When Mr. Spry expressed concerns, Halmi told him "Should be ok, but we might need to change the payment schedule in the short term."

23. Over the next month and a half, Mr. Spry, on behalf of Zylar, repeatedly requested status updates from Halmi, who continued to promise that payment would soon be made by Screen Media to HHL and then to Zylar.

24. Finally, on April 4, 2023, Zylar received a late and partial payment of $500,000 of the $750,000 past due second installment.

25. Throughout the next six months, Halmi continued to string along Zylar and Mr. Spry, stating that Screen Media and CSSE were "close to closing their new bank deal" and, almost weekly, promised that Screen Media would soon have access to funds and that its payment to Zylar would be imminent.

26. On May 18, 2023, Halmi assured Mr. Spry that Screen Media would be able to get caught up in about two weeks. He added, "I have been acting <u>as your advisor</u> at your request based on our relationship and the other projects we are currently working on. I received no compensation for any of these Screen Media/[HHL] deals. I am happy to still help in anyway, but at some point you may want to deal directly with them."

27. However, despite Halmi's suggestion that Zylar should "deal directly" with Screen Media, when Zylar tried to do so, it was told that any discussions related to Screen Media's license would need to go through Halmi, since there was no direct deal between Zylar and Screen Media. Moreover, despite signing the Screen Media License Agreement, Screen Media's president, David Fannon, outrageously claimed that he knew nothing about the deal. Thus, because Halmi and Screen Media each claimed that the buck stopped with someone else, Zylar was effectively left with nowhere to turn in order to get paid the money it was undisputedly owed.

28. In August 2023, Halmi told Mr. Spry that Great Point Media ("Great Point"), a production financing company Halmi co-founded, was "stepping in and arranging a loan to Screen Media to help get them current." And then on August 31, 2023, he specifically assured Mr. Spry that he had "arranged for Great Point to step in and help out" and that $750,000 would be paid within the next week. However, despite continued similar promises over the next month that payment would be channeled from Great Point through Screen Media to HHL to Zylar, Zylar did not receive any more money.

29. To date, beyond the initial payment that it received, Zylar has received nothing but the run around from HHL, Screen Media, and Halmi. HHL's failure to pay what it owed Zylar under the Zylar License Agreement is particularly concerning given that, under the Screen Media License Agreement, HHL was entitled to receive (and on information and belief, did receive) $9.6 million prior to when its first payment to Zylar was due in December 2022. And yet HHL defaulted from the second installment onward.

30. On November 27, 2023, after over a year of financial losses and the inability to exploit the rights subject to the Zylar License Agreement, Zylar terminated that agreement, citing HHL's various material breaches of contract. However, while that termination resulted in Zylar receiving back the rights to some (but not all) of the Zylar Projects, the value of those titles was already substantially tainted by the fact that they were already exploited by Screen Media (at the expense of Zylar, which never received its promised payment).

31. Simply put, it is now apparent to Zylar that it was defrauded by Halmi, who induced Zylar to turn over the rights in the Zylar Projects for compensation that Halmi knew would never be

paid based on promises that Halmi knew he would never keep.  Instead, Zylar reasonably suspects that Halmi received some or all of the monies paid to HHL under the Screen Media License Agreement, which should have been paid to Zylar.  Hence, having been left holding the proverbial bag, Zylar has now been forced to seek recourse against Halmi through this action.

## **FIRST CLAIM FOR RELIEF**

### **(FRAUD)**

32. Plaintiff incorporates by reference Paragraphs 1 through 31 above as if fully set forth herein.

33. Upon information and belief, before and after Plaintiff entered into the Zylar License Agreement with HHL, Halmi deliberately made false representations of material fact to Plaintiff and its representatives regarding, *inter alia*, his role in the transaction between Plaintiff and HHL, the purpose of the Zylar License Agreement, his relationship with HHL and Screen Media, and his communications with Screen Media regarding HHL.

34. From in or around August 2022 until in or around November 2023, Halmi deliberately and maliciously made misrepresentations to Plaintiff, both over the phone and by email, including but not limited to, by misrepresenting the Zylar License Agreement as a transaction between Plaintiff and Screen Media, by stating that he represented HHL in the United States, by stating that he would receive no compensation for the deal between HHL and Screen Media, by misrepresenting both HHL and Screen Media's solvency, by stating that Screen Media would be able to catch up on overdue payments from February to May 2023 and promising almost weekly that payment would be forthcoming, by misrepresenting his own involvement in the transactions, and by misrepresenting his motives for arranging the deal between Plaintiff and HHL/Screen Media.

35. Plaintiff is informed and believes and based thereon alleges that Halmi knew that his misrepresentations were false at the time he made them.  As just one example, Halmi has now purported to disclaim any relationship with HHL, even though he previously assured Plaintiff that he "represented" HHL.

36. Plaintiff is informed and believes and based thereon alleges that Halmi deliberately misrepresented the circumstances of the Zylar License Agreement and the Screen Media License

1 Agreement to induce Zylar into entering into the Zylar License Agreement despite his knowledge that Zylar would not ultimately be paid the entirety of what it was owed for the Zylar Projects.

37. Plaintiff relied on Halmi's materially false and misleading representations to its detriment by entering into the Zylar License Agreement and then continuing to allow its rights to be exploited thereunder even after HHL failed to timely make its payments.

38. Plaintiff's reliance on Halmi's misrepresentations was reasonable and justifiable in that Plaintiff had no reason to doubt the truthfulness of Halmi's representations, who repeatedly held himself out as a representative of HHL and Screen Media.

39. As a direct and proximate cause of Halmi's misrepresentation, Plaintiff has suffered and will continue to suffer monetary harm and significant damage to its reputation. Consequently, Plaintiff is entitled to damages in an amount to be proven at trial, but no less than Twenty One Million One Hundred Thousand Dollars ($21,100,000).

40. Plaintiff is informed and believes and based thereon alleges, that the aforementioned acts were done intentionally or with a conscious disregard of Plaintiff's rights, and with the intent to vex, injury, or annoy Plaintiff, such as to constitute oppression, fraud or malic thus entitling Plaintiff to exemplary and punitive damages in an amount appropriate to punish or set an example of Defendants, and to deter such conduct in the future, which amount will be proven at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as follows:

1. For a money judgment in an amount to be proven at trial but no less than Twenty One Million One Hundred Thousand Dollars ($21,100,000);

2. For exemplary and punitive damages in an amount sufficient to punish and deter Defendants, the exact sum in an amount to be determined at trial;

3. For all costs of suit;

4. For pre-judgment and post-judgment interest;

5. For such other relief as the Court may deem just and proper.

//
//

1  Dated: January 16, 2025

LAVELY & SINGER
PROFESSIONAL CORPORATION
DAVID B. JONELIS
MEGAN S. MALLONEE


By: ___*David B. Jonelis*___
      DAVID B. JONELIS
Attorneys for Plaintiff
ZYLAR PICTURES, LLC

COMPLAINT

**DEMAND FOR JURY TRIAL**

Please take notice that Plaintiff ZYLAR PICTURES, LLC hereby requests a trial by jury.

Dated: January 16, 2025

LAVELY & SINGER
PROFESSIONAL CORPORATION
DAVID B. JONELIS
MEGAN S. MALLONEE

By: *David B. Jonelis*
    DAVID B. JONELIS
Attorneys for Plaintiff
ZYLAR PICTURES, LLC